(26 Civ. Proc. R. 190.)

### GRIGGS v. DAY et al.

(Supreme Court, Special Term, New York County. January, 1897.)

APPEAL—SETTLEMENT OF CAUSE—ORDER OF EVIDENCE.

On a hearing before a referee, testimony contained in the printed record of a former trial of the cause was read under stipulation, but it was not read in the order in which it was contained in the record. At first it was taken down in full by the stenographer, but afterwards was merely indicated in the stenographer's minutes by reference to the record. It then became apparent that changing the order of the testimony had produced obscurity and confusion, though up to that time the hearing had proceeded on the theory that the testimony should be considered in the order in which it was read. With the view of obviating such difficulty, the matter was discussed before the referee, and a note was entered by him in his register, stating that the "counsel concurred in recommending the referee to examine testimony in order in printing record." At the request of the referee, a copy of the printed record had been marked so as to indicate the parts read by the respective parties; and afterwards references were made to the pages or folios thereof, and not to the stenographer's minutes, as before. The referee died after deciding the case, but before an appeal was taken. *Held,*

that there was a course of practice amounting to a stipulation that the evidence should be considered in the order in which it appeared in the printed record, and the defeated party, in settling the cause on appeal, was entitled to have it inserted in that order.

Action by Clark R. Griggs against Melville C. Day and another as executors of the will of Cornelius K. Garrison, deceased.

Before HENRY W. TAFT, Esq., Referee.

John H. Post and John R. MacArthur, for plaintiff.
Horace Russell and William R. Bronk, for defendants.

TAFT, R. This action was commenced in January, 1884. The plaintiff sued to compel Cornelius K. Garrison, the defendants' testator, to render an account in relation to certain transactions growing out of the building of the Wheeling & Lake Erie Railroad. The plaintiff was the contractor who constructed most of that road. Cornelius K. Garrison, the former defendant in this action, advanced money to the plaintiff with which to carry out his contract. The action was first tried before Hamilton Odell, Esq., referee, and he directed judgment in favor of the defendant for a large sum of money. Upon appeal this judgment was set aside. The case was tried a second time before William B. Hornblower, Esq., referee, and he rendered judgment for a considerable sum in favor of the plaintiff. An appeal was taken to the general term, and thence to the court of appeals, from this judgment. The latter court set it aside. 32 N. E. 612. The third trial of the case was before Austin Abbott, Esq., referee, and he directed judgment in favor of the plaintiff for nearly $700,000. Before the time had arrived for the making of a case upon the appeal from this judgment, Mr. Abbott died; and by order of the supreme court entered September 29, 1896, it was referred to me to settle the proposed case on appeal, and for that purpose to take evidence as I might be advised. There have been numerous hearings before me, and, besides the oral testimony of counsel and others present at the trial, the several parties have introduced a large mass of documentary evidence, including the stenographer's minutes of the trial before Mr. Abbott, several copies of a printed record upon the former appeals, and various memoranda and entries of the referee in relation to the case and his consideration of it. Prior to the trial before Mr. Abbott the parties entered into a stipulation that either party might read from the printed record of the trials before Mr. Hornblower and Mr. Odell. The following portions of this stipulation are material, viz.:

"It is hereby stipulated and agreed that either party hereto may * * * read from the printed case on said appeal the testimony of any witness therein contained, or any portion thereof, with the like force and effect as if such witness had been personally produced, and as if the said evidence had been given in the presence and hearing of the court or referee who may try said action on the new trial."

Pursuant to this stipulation, the plaintiff's counsel, after offering at the first hearing, on June 24, 1893, certain documentary evidence, proceeded at the next hearing, on June 27, 1893, to read the testimony of the plaintiff himself, as it appeared in the printed record.

He did not read this testimony in the order in which it appeared in the printed book, but read such selections from it as he deemed proper and necessary to prove the plaintiff's case. What he read at this state of the trial was incorporated in extenso in the stenographer's minutes, and the direct examination of the plaintiff extended over 32 pages of the minutes. Upon the same day the defendant's attorney read (as it is stated in the stenographer's minutes) "from the printed record, under the stipulation entered into, the balance of the direct examination of the plaintiff given in response to questions put to him by his own counsel, and not read in evidence by Judge Arnoux [the plaintiff's counsel]." As may be inferred from the above statement, the defendant did not read the evidence of the plaintiff consecutively, but read portions here and there, which the plaintiff's counsel had omitted to read. He continued to read this evidence at the next hearing, on June 28, 1893, and, as before, the testimony was written out in the stenographer's minutes, extending through page 92 of those minutes. The trial was then adjourned over the summer, and the next hearing was held upon October 14th. At that time the counsel for the defendant expressed his intention of using and reading in evidence all of the balance of the plaintiff's testimony, with the exhibits referred to therein, "either in connection with the plaintiff's own testimony, or as part of the defendant's case, or as a declaration of the party to the action; plaintiff reserving the right to make such objection as he may be advised to parts of such evidence as are, in his opinion, inadmissible for any legal reason, when the same is offered, or at the next session before the same shall be considered in evidence." The plaintiff's counsel objected to this method of procedure, and the referee ruled that the stipulation did not override the regular rules as to the order of proof upon the trial; and, after considering the question, he rendered a formal decision at the hearing of October 28, 1893, in which he held that the ordinary method of introducing evidence must be adhered to, namely, that the plaintiff should exhaust his examination in chief, and after he had closed the defendant should read what he desired as part of his own case. At the hearing of November 1, 1893, a further discussion as to the order of proof was had, and the defendant's counsel sought to reserve the right of reading further testimony of the plaintiff, and after a discussion the referee said:

"I am of the opinion, however, that a strict order of proof is not commonly requisite in such a case as this, and I will allow the defendant to reserve for the present any part of the strict cross-examination, and will hear plaintiff's application to read, consequently, out of its usual order, anything rendered relevant by the defendant's reading the part now reserved."

He added:

"I permit him to reserve his cross-examination for the present, but my impression is that, unless some cause is shown, the cross-examination must be completed before the defendant asks plaintiff whether he has closed his case."

The plaintiff then proceeded to read further the testimony of the plaintiff from the printed case. He continued this during the hearing of November 2d, and at that hearing a further discussion took place as to the order of proof, at which the referee made the ruling in which

he said that the time had now arrived when they had reached, "not merely the conclusion of the direct but the conclusion of the testimony of the witness"; and he therefore ruled that the defendant should proceed with the cross-examination, adding these words:

"I accompany that, however, with the statement that this is not a case, in my judgment, for applying a strict order of proof any further than what is necessary to secure clearness in the result; and I shall, without hesitation, entertain an application to allow reading at a later stage of such cross-examination for any good reason. In my judgment, however, for the sake of clearness and to avoid confusion, as I said before, I think it would be wise for us to preserve the original order."

After this time, though the testimony was read to the referee, it was not set out in the minutes, but was indicated by reference to the folios of the printed record, and by reading the opening and closing words of each excerpt read. The testimony of the plaintiff was thus read on cross, redirect, and recross, the reading being suspended from time to time to permit the examination of other witnesses. Some time prior to March, 1894, the referee requested the plaintiff's attorney to mark in some way the parts of the old record which were read in before him. At a subsequent session he refers to this suggestion, saying that he told counsel:

"That, if they wished to put in evidence only parts of the previous record, they should mark a copy of the record in colored pencils,—one color against the passage read by the plaintiff, and another color against the passage read by the defendant,—submit the printed record to me [him], and I [he] would only regard the evidence they so put in; but that was not adopted until the very close of the trial."

The plaintiff's counsel, however, without the knowledge of the counsel for the defendant, adopted the suggestion in March, 1894, to the extent of cutting out the excerpts of testimony which he had read, pasting them in a book in the order in which they had been read by the plaintiff's counsel, and handing them to the referee. This book only contained what had been read by the plaintiff's counsel on direct or redirect. It contained no cross-examination. The referee appears, however, to have had a copy of the printed record before him throughout the trial, and to have referred to it from time to time as the testimony was read in. The recross-examination of the plaintiff was suspended at the hearing of March 16, 1894, and was not resumed until June 21, 1894, though there were numerous hearings in the meantime at which other witnesses were examined. On July 20th an adjournment was taken until September 20th. On the latter day a stipulation was entered upon the minutes as follows:

"Counsel agree that when the reference adjourns to-day the next session shall be September 20, 1894, and that a stipulation as to the accounts and the matters therein covered shall be submitted to the referee, with the stenographer's minutes, within a reasonable time after adjournment to-day, and the case shall be then deemed so far complete as to enable the referee to proceed with its consideration, subject to such further evidence as may hereafter be received."

After that stipulation was noted, and before the counsel separated, there was a conversation in relation to marking and laying in before the referee a copy of the printed record of the former appeal, from which extracts had been read from time to time. It was then ar-

ranged that the plaintiff's attorney should prepare a copy of the record, marking with colored pencils opposite the passage read by the one party or the other,—blue to indicate what had been read by the plaintiff, and red what had been read by the defendants,—and that that book, so marked, should be submitted to the defendants' attorney for corrections, and then to the referee, in order that he might read the evidence from that record in that order, and not have to pick it out from the stenographer's minutes. The conversation in relation to this understanding seems to have been occasioned by a request of the referee that Mr. Heasley, the plaintiff's counsel, furnish him with further slips of evidence, which he had up to that time been cutting from the record, and delivering to the referee as the trial proceeded. In response to this request, Mr. Heasley stated to the referee that he had concluded to discontinue this method of presenting to the referee what had been read, and to adopt the suggestion which the referee himself had made at an early hearing in the case,—to mark the book in pencil of different colors. Mr. Heasley stated to the referee that the method which he had first adopted had proved to be unsatisfactory. His reason for coming to this conclusion he thus expressed:

"Of course, as I proceeded afterwards to put in further testimony of the plaintiff, I would, of course, run across reference to the cross-examination of Mr. Griggs, which I, at Judge Arnoux's request, had omitted; and that was the principal reason why I stopped continuing that book. I did not deem it fair to the plaintiff, or did not deem it fair to the defendants in the case."

The referee responded that whatever method counsel agreed in adopting and placing before him would be acceptable to him. Pursuant to the understanding of July 20th, Mr. Heasley marked the printed record, and submitted it to Mr. Bronk, the attorney for the defendants, who examined it and agreed to its correctness. On August 23, 1894, it was submitted to the referee. The record thus presented to the referee contained none of the defendants' evidence, and a very large portion of the testimony of the plaintiff himself then remained to be read. But (to anticipate in the order of time) when the printed record was finally submitted to the referee, in June, 1895, with the entire case, there had been marked as read in practically all of the testimony which had been adduced upon the first two trials of the case,—at least, all of such testimony as had any bearing upon the question of the allowance of a credit to the plaintiff of nearly $2,000,000 on account of certain notes, which were the principal subject of dispute on the accounting. It appears from an entry made by the referee in his office register that on September 29, 1894, he analyzed the testimony as far as page 114 of the stenographer's minutes, "fol. 1688" (probably meant to be 1698). This was a comparatively small portion of the printed record which was ultimately introduced. There are certain circumstances in evidence which indicate the manner in which the referee made this examination: After his death, in his copy of the minutes were found slips of paper upon each of which he had written a reference to the testimony he wished to refer to, the date to which it referred, and the page at which it appeared in the stenographer's minutes. The references

upon these slips were as far as page 92 of the stenographer's minutes, up to which point, as I have said, the testimony was written out in extenso. Thereafter, and up to folio 1698, similar slips were found in the printed record which had been submitted to the referee; the only difference in these slips being that, in addition to the page in the stenographer's minutes, the folio in the printed book was stated. These slips seem to have been found at the pages to which they refer, and to have been in the order of the stenographer's minutes. They indicate to me, in connection with the entries in his register, that the referee confined himself, in this examination, to the order of the stenographer's minutes. So that, whatever might have been the effect of the understanding of counsel on July 20th in relation to the effect of submitting to the referee a copy of the printed record marked in different colors, it is evident that at the time of this examination of September 29, 1894, the referee did not examine, and perhaps did not consider himself at liberty to examine, the testimony, in the order in which it had been introduced upon the former trial. At the hearing of October 18, 1894, the subject was brought up again, and an agreement made, of which the following note was entered in the referee's handwriting in his office register:

"October 18th, 1894. Present, Ex-Judge Arnoux and Mr. Heasley and Mr. Bronk. Counsel concurred in recommending the referee to ex. test. [examine testimony] in order in printed record."

After this, and up to the time when the case was finally submitted to the referee, in June, 1895, he was furnished with the copy of the printed record first handed him on August 23, 1894, which was kept marked up from time to time as the reference progressed,—the two colors indicating which party read the evidence; a single blue line indicating the direct or redirect of the plaintiff; a single red line, the cross or the recross of the defendants; a double red cross line indicating the evidence read by the defendants as a part of their case in chief; a double blue line indicating the cross-examination upon such testimony; a triple blue line indicating the evidence in rebuttal read by the plaintiff; and the triple red line indicating the defendants' cross-examination on such rebuttal. Upon the margin of this book there were also written by the defendants' counsel the objections to evidence, and the rulings of the referee thereon; the grounds of such objections and rulings being frequently, if not always, stated with a reference to the page in the stenographer's minutes at which they might be found. It appears to have been known to all parties that the referee was, during the progress of the reference, considering the testimony read from the book as it appeared therein. But there is nothing else significant of the order in which that testimony, when read, was to be considered in evidence (excepting the fact that in reading the parties continued to adopt an order different from that in the printed book; this I will refer to later) until after the case was finally submitted to the referee, and he had indicated to the parties that he had reached a conclusion favorable to the plaintiff, and was ready to render his decision. This was on December 24, 1895, at a hearing at which the defendants made an argument in support of a

motion for a reargument.    At this hearing the referee made the following remarks:

"After the evidence had been taken in shorthand, and written out in the evidence, I was furnished with a volume perfectly convenient for the purpose of examining the evidence actually given, and such record contained, marked in that way [described above], such of the evidence as had been read by either party, and in a way by which I could tell at once which party read it. My plain duty, under these circumstances, was to examine the evidence which had been offered before me, and to close my eyes to anything in the record which had not been offered before me, and which counsel had carefully avoided offering or putting before me. That volume, though perfectly convenient for the purposes of examining the evidence, appeared to be imperfect. It was not a representation of all that had taken place on the previous trial. It began at page 266 in one copy. In one copy, which appeared to be complete to the end of the trial, passages were marked as canceled; and I accordingly confined myself to the stenographer's minutes for the new testimony taken on this trial, and to the parts which had been thus marked for me as read in evidence from that record on the present trial."

This was followed by a formal opinion deciding the case, in which the referee made frequent reference to the evidence, and in every instance referred to the pages or folios in what he designated the "printed record."

It is necessary, in order to interpret these various steps and proceedings before the referee, and to say what they all amounted to, to consider the nature of the testimony to which they referred. When the plaintiff's attorney began the direct examination of the plaintiff from the printed record, the excerpts which he had read were so selected as to make in the main a coherent narrative, although there are several instances where it was impossible to preserve entire clearness. When, however, the defendants began to read from the plaintiff's testimony upon cross-examination, it began to appear that if what they read was to be considered by itself, and not in relation to that which appeared at and before the folio to which they referred, in repeated instances the testimony would, by being taken from the context, either convey no sensible idea at all, or would contain obscure and inexplicable references. The same condition occurred in the redirect examination of the plaintiff, and throughout the case wherever his testimony was read again. It was also common in the testimony of other witnesses examined upon the former trial. There were pointed out upon the hearing before me some instances of incoherence and obscure reference in the testimony, particularly in the cross-examination of the plaintiff. But I was not satisfied by what was then shown that the extent of this condition was so great as to be material or appreciable in such a voluminous record as that in this case. I have therefore deemed it necessary to examine the testimony which was read in before the last referee in the order in which it was read in, for the purpose of satisfying myself whether or not the instances of incoherence, obscurity, and diverted meaning were common throughout the case. I have found such a large number of instances that I am of the opinion that, unless some method is adopted for avoiding such a result, the significance of much of the testimony read upon this trial from the printed book will be materially different from that which it had upon the last trial. It

should not be assumed, unless it is very clear, that the parties in-
tended to create such a condition of the record as this.    On the con-
trary, it must be assumed that they desired to introduce a clear and
coherent narrative, which would give to the evidence the same force
and effect that it had on the former trial.    The referee repeatedly
expressed his desire for this result.    But he must have discovered
in examining the testimony in the summer of 1894, and the counsel
for the parties must themselves have been aware, that the record was
not in the condition which they desired.    It is natural, under these
circumstances, that the referee should have made, and that counsel
should have adopted, the suggestion that some step should be taken
to secure clearness.    The obvious way to accomplish this was to agree
that the testimony in the printed record should be deemed to have
been introduced in evidence in its original order.    The entry of Octo-
ber 18th, if regarded as evidence of the existence of such an agree-
ment, would be a logical sequence of what had gone before.    Con-
strued as a mere recommendation affecting no legal right, it was un-
necessary, has no reasonable explanation, and was ineffectual.    I
cannot adopt such a construction.    It is true that the language of the
entry is not that which usually imports a fixed and final stipulation.
But a course of procedure persisted in, as it was in this case, through
a period of many months, with such a significant memorandum to
throw light upon the intention of the parties, is tantamount to a
stipulation.    The situation is like that in which a party has adopted
upon a trial a certain theory.    He may not, after judgment has been
rendered, shift his position, and for the first time upon appeal present
a new theory, even though, if presented below, it must have prevailed.
Vose v. Cockcroft, 44 N. Y. 415; Delaney v. Brett, 51 N. Y. 78;
Spickerman v. McChesney, 111 N. Y. 686, 19 N. E. 266.    In Elliott's
General Practice, at section 93, it is said that a theory of a case "is a
mental creation embodying the principles of action, the scheme of
conduct, and the methods of procedure."    See, also, section 140.    In
Lant v. Rasines, 18 Misc. Rep. 414, 41 N. Y. Supp. 1120, the conduct
of a party in certain steps of a suit was held to estop him from adopt-
ing an inconsistent course at a later time, the previous step being held
to be "in the nature of a stipulation binding on the parties to it."
After the conversation of July 20th, followed as it was by the agree-
ment of October 18th, and the subsequent course of practice, it seems
to me that the defendants' counsel was justified in trying his case
upon the assumption that the referee was to be deemed to have access
to the printed book for all purposes of considering the evidence, and
that it was unnecessary for him to elucidate each portion of the testi-
mony read by adding thereto explanatory notes, or placing upon the
record those passages in the book which were necessary to explain
that which was actually read in the presence of the referee.    Under
such circumstances, it would be inequitable to allow the plaintiff to
say that the method of procedure which was adopted by both parties
was not in the nature of a stipulation that, when the testimony had
all been read in, it was to be considered in evidence in the order, con-
nection, and relation in which it appeared in the printed book.    But
it had been urged that, if it had been the intention of the parties to

change the order of the arrangement of the testimony for any purpose whatsoever, they would not have proceeded after October 18, 1894, to read in from all parts of the record detached and widely-separated excerpts. But in my opinion this circumstance does not outweigh the considerations which I have mentioned. Upon the evidence as it was printed, the court of appeals had rendered a decision adverse to the plaintiff. Naturally, his counsel did not desire the same record to be before the referee, except so far as it was necessary for him to use it to establish his own case. Early in the trial the defendants sought to introduce all of the plaintiff's testimony which had not then been read. But the plaintiff's counsel objected, and insisted to the end of the trial upon proceeding in accordance with the strict rules of order of proof. He no doubt thought that this policy would enable him to exclude much of the testimony introduced before. Such a course of action is not inconsistent with a willingness to have whatever evidence was finally admitted considered by the referee, for the purpose of making his findings and conclusions therefrom, in the order in which it appeared in the printed book. I am therefore led to the conclusion that the referee would have considered, upon a settlement of the case, that the evidence could not be presented to the appellate court in the way in which it was submitted to him by consent of counsel unless it was set forth substantially in the order in which it appeared in the printed book, and I am of the opinion that it should be so settled.

It was claimed in behalf of the defendants that, even if there was no stipulation to be inferred from the circumstances of this case, I should, in my discretion, settle the case as they propose it, because it is impossible in any other way to give the evidence which was introduced the same meaning upon this trial which it had upon the trial before. I am inclined to believe that the position of the defendants in this respect is at least partially correct. The defeated party is entitled to have the case presented to the appellate court in such a way that the error will clearly appear. Carman v. Pultz, 21 N. Y. 547. It is said in Clark v. Donaldson, 49 How. Prac. 65, that:

"It was the duty of the appellant, if he desired to raise any question here, to have so made his case as to show plainly that an erroneous ruling was made adversely to him, and not to have left that fact to appear by mere inference or conjecture."

Any doubt or ambiguity in respect to the questions which appellant wishes to have reviewed must necessarily result to his injury. White v. Knowles (Sup.) 6 N. Y. Supp. 579. In Gleason v. Smith, 34 Hun, 547, it is said that the case should be settled so as "to secure an effectual and intelligent reconsideration of what may have taken place." It therefore becomes the duty of the appellant to make the case on appeal as clear and coherent as possible, and it is not the right of the respondent to make that obscure which was clear as it was presented to the court below. Of course, the case presented must be true. For the sake of clearness nothing can be inserted which did not actually happen. If everything which occurred upon the trial of this case were to be presented to the appellate court, it would be necessary, in my opinion, to twice transcribe in the case on appeal

the evidence introduced before the referee; for it was actually read at each hearing to him in the order in which it appears in the stenographer's minutes, and almost simultaneously a book was handed to him in which it appeared in a different order. But I am satisfied it is my duty to avoid such a duplication. The practice of making a case on appeal is now governed by rule 34, which provides as follows:

"But the facts of the case, together with the rulings on the trial, shall be stated in a narrative form, except that, where it is claimed by either party that any particular testimony should be given in hæc verba, the judge or referee who settles the case shall determine whether or not a proper presentation of the case for review requires such portion of the evidence to be so stated in hæc verba; whereupon the case shall be made accordingly."

This portion of rule 34 was first inserted in the rules of 1880. In the first rules adopted after the enactment of the Code, in 1858, it did not occur. The rules of 1871, 1875, and 1877 contain provisions in relation to the settlement of a case. The subject was also generally regulated by section 223 of the Code of 1848, and now by section 997 of the present Code, both of which provide for a settlement "according to existing practice." From an examination of the Codes and rules of the Code, I have discovered no indication of a substantial change in the practice of settling cases. It would seem, therefore, that the following decisions are not, as plaintiff's counsel claims, obsolete or inapplicable.

In Smith v. Grant, 15 N. Y. 590, which was decided before the rules of 1858 went into effect, the court of appeals, referring to the practice in making a case, said:

"It has been too generally supposed that there is now something new, difficult, and strange in the manner of preparing cases for appeal, and accordingly we find them prepared frequently in modes never heard of in any known system of practice. A case is now, in its substance, very nearly, if not identically, what a bill of exceptions always was in legal practice, except as to the formal statement of facts which is now required to be inserted."

In Price v. Powell, 3 N. Y. 322, the court of appeals, in criticising a case, said:

"Instead of giving, as it should, a plain and concise statement of the facts out of which the questions of law arise, the bill is made up of portions of the evidence, and these are set forth in detached and scattered parcels; making it necessary to hunt through the whole case, and draw inferences, to get at the facts relating to a single one of the many questions made by the bill, and rendering it difficult, if not impossible, to determine what are the legal rights of the parties. If it is proper to review such a case, every doubt about the facts should be turned against the party making the bill."

In Bissell v. Hamlin, 20 N. Y. 519, the action was tried before a referee, and a motion was made to dismiss the appeal on the ground that no case had been prepared in accordance with law and the decisions of this court. The court, after referring to a number of matters which had been improperly inserted in the case, proceeded, through Comstock, J., as follows:

"It could not have been necessary, for any conceivable purpose, in making a case to review the trial, to prepare a literal transcript of all the testimony. I think these cases are often prepared by an attorney's clerk, who is directed to copy the notes of the lawyer who attended the trial, and such copy is then served as the proposed case. This is the worst possible mode of presenting

a cause to a court of review. The legal merits of a controveis, are in danger of being lost in a mass of crude and useless detail. The office of a case is simply to present the questions which are to be examined in the appellate court. It should present those questions with legal and logical precision. A practitioner who proposes to bring an appeal should know what are the points in the controversy capable of being reviewed, and he should propose his case in a condensed form, presenting only those points. A trial usually settles many things beyond the reach of an appeal, and everything not material to the discussion in the appellate court should be omitted. In the instance before us we have one of the crudest specimens of a case which I have ever seen. The question at the trial was whether the defendant owed the plaintiff a very small sum for services. As the matter is presented to us, we must wade through one hundred printed pages of evidence in order to understand the merits of the controversy. There is no settlement of the facts or statement of the legal questions. We are not required to review cases in this form. * * * The case itself should consist of a complete and condensed summary of all the facts deemed material. It should embody a statement of the questions intended to be reviewed, and of the rulings of the referee on each question."

In Howland v. Woodruff, 60 N. Y. 77, the court of appeals, in 1875, through Judge Allen, said:

"If, by any protest on our part, the profession could be induced to abandon the machine-made cases which, under the present system, have taken the place of the methodical and carefully prepared cases and bills of exception of former days, the court would plead earnestly for such a reform, as it would be a great relief to every court of review, and aid in the dispatch of business and in an intelligent administration of justice. Stenographers have taken the place of the attorneys whose duty it is to prepare, and of the counsel whose duty it is to peruse and examine, and of the judge who should settle, cases and exceptions for the purposes of review. The rough, ill-digested, and defective and frequently unintelligible transcripts and translations of the stenographer's minutes of the trial, without correction or explanation, are stitched together and labeled a 'case,' or 'exceptions,' as may suit the fancy, and the labor is thrown upon the court to wade through a mass of stuff, and dig out the kernel of facts or the point of an exception which may be buried up beneath it."

In Dunlap v. Hawkins, 2 Thomp. & C. 292, 298, 299, the court said:

"I cannot leave this case without expressing my disapprobation of the manner the record is made up. It contains 140 pages, when all that is material in it could have been contained in one-quarter of that space. Deeds have been presented at full length, together with certificates of acknowledgment, and the papers offered in evidence are copies of the record. Judgment records and executions are presented in full, when half a dozen lines would give to the court all the information it needed in regard to them. A case thus made imposes great and unnecessary expense upon clients, unnecessary labor upon the court, and confuses, rather than enlightens, it."

See, also, Tweed v. Davis, 1 Hun, 252; Bohnet v. Lithauer, 7 Hun, 238; Marckwald v. Navigation Co., 8 Hun, 547.

Under the old practice it was the duty of the appellant, in making up a bill of exceptions, to make a condensed statement of what he thought he had proved by his witnesses. See Forsyth v. Matthews, 14 Pa. St. 100. I am referred to no authority holding that in a proper case the court has not the power at the present time to state the testimony in this way, if it deems it proper, in its discretion, so to do, or that by so doing it will not be stating "the facts of the case * * * in a narrative form." The use of the word "facts," instead of "testimony" or "evidence," in rule 34, in connection with the strong expressions of the courts which are quoted above, seems to indicate an

intention to continue such power, and to encourage its exercise. In this case, however, I am not asked to condense the testimony within the narrowest possible limits, but only to determine which of two suggested methods will state "the facts" of the case in the more condensed form. As I have already said, there are repeated instances in the plaintiff's own testimony where the sense would be lost or confused by settling it in the order in which it was read, while, if the order of the printed record is preserved, the testimony retains substantially its original significance. It might be possible, by the insertion of explanatory notes and repetition of testimony somewhat in the manner proposed by plaintiff, to give to the case the sense which it had to the referee with the aid of the printed book before him. But that would incumber the case with frequent repetitions and insertions, tending to anything but condensation. So that I am satisfied, from a careful consideration of the results of the two methods proposed, that, in the case of most of the amendments, the clearest and most concise way will be to state the testimony substantially as the defendants propose. The plaintiff urges, however, that this should not be done, because, if the method of reading in the testimony resulted in the destruction or change of the sense of any portion of it, the party who failed at the time to make upon the record such an explanation as would give the evidence the sense which it had in the printed record must now suffer the consequences. I do not think that, in view of the way in which this case was tried, such a strict rule should be applied. Excepting the first 26 pages of the stenographer's minutes, which was the direct examination of the plaintiff, and forms a comparatively insignificant portion of the old testimony introduced upon the trial, the uniform practice of the parties was to refer to the folios at which the evidence read appeared in the printed record, and this reference was entered in the stenographer's minutes. The old record was all the time in the referee's hands. In the light which the entry of October 18th and the subsequent expressions of the referee, referred to above, throw upon this practice, I can construe it as no less than a submission in evidence not only of the passage read, but also of so much of the rest of the record as was necessary to preserve the original meaning.

My conclusion is, therefore, that, if I had not been able to find that there had been a course of practice amounting to a stipulation that the testimony should be considered in evidence in the order in which it appeared in the printed book, I would still have considered that the proper way of presenting the testimony of the plaintiff to the appellate court, as it was presented to the referee, would be by making the printed book the basis of the settlement of the case, wherever it was necessary to do so in order to preserve the sense or to condense the narrative. So far as the testimony of the other witnesses who were examined on the last trial is concerned, it might be possible to arrange their testimony briefly, and in such a way as to be clearly understood, without following strictly the order in the printed record. Considerable portions of their testimony were omitted, and the arrangement in the order in which their testimony was read, without explanatory notes, would not have such a serious effect upon the

sense as in the case of the plaintiff's testimony. It is not necessary to go into detail upon this point. I have not passed upon each amendment proposed, but have deemed it best to adopt the suggestion made by counsel that I decide the main, underlying question, as to what should be the general order in which the testimony should be arranged, and thus dispose of a large number of the amendments. I have, however, considered several other of the points of somewhat general application. Wherever it appears from the record of the stenographer's minutes, or from the printed record submitted to the referee, that testimony was originally given upon a certain date, that fact should be stated in the case, for the reason that it is to be construed as having been stated before the referee by the one party, and not disputed by the other; thus being, in effect, an admitted fact. In the statements which appear as marginal notes upon the case presented for settlement, it should appear by whom the testimony was elicited, and whether upon direct, cross, redirect, or recross, etc. The minutes of the meetings of the directors of the Wheeling & Lake Erie Railroad Company may be inserted in the case as they were contained in the minute book, with some appropriate note showing which party read the various extracts. It appears that when the printed record was prepared for the referee in August, 1894, the testimony was not arranged in the order in which it was contained in the original record, but the plaintiff's counsel rearranged it. The plaintiff had previously testified at different times in the case, and his testimony appeared at different places therein. The plaintiff's attorney gathered together all of the plaintiff's testimony, and bound it in one volume, and in a separate volume bound the testimony given by the other witnesses, somewhat changing the order in which they had been examined. This had no effect in changing the sense or connection of the testimony, and the evidence before me seems to indicate that it was this volume, so far as marked, that was approved by the defendants' attorney before submission to the referee, and that this was the book which the plaintiff's attorney continued to mark and submit to the referee from time to time as the trial proceeded. It appears that the defendants' attorney also submitted a marked book, but I am inclined to think that the book which is to be considered as the book referred to in the entry of the referee, and consequently as the printed record, is the book arranged as plaintiff's counsel arranged it. Upon this point, however, if it is deemed important, I will hear counsel further.